UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

MICHAEL A. LARSON,                    )
                                      )
         Plaintiff,                   )
                                      )
v.                                    )         No.:  3:13-CV-73-TAV-HBG
                                      )
THE RUSH FITNESS COMPLEX,             )
                                      )
         Defendant.                   )

## MEMORANDUM OPINION

This civil action is before the Court on defendant The Rush Fitness Complex's

Motion for Summary Judgment [Doc. 24].  Plaintiff filed a response in opposition [Doc.

30], and defendant replied [Doc. 32].  The Court has carefully considered the matter and,

for the reasons stated herein, will grant defendant's motion as to plaintiff's remaining

claims.[1]

I.       **Background**

Michael Larson was employed by The Rush Fitness Complex ("The Rush" or

"defendant") as a personal trainer [Doc. 25 p. 2; Doc. 30-1 p. 4].  He was an at-will

employee who underwent two surgeries on his right knee in 2011 [Doc. 25 p. 2–3].  After

plaintiff's February surgery, plaintiff was able to return to The Rush and perform all his

duties as a personal trainer by May 2011 [*Id.* p. 2].  The following month, however, a

_____

[1] Defendant requested oral argument on its motion for summary judgment [Doc. 24 p. 2].
The Court considers requests for oral argument on a case-by-case basis, and upon review of the
record, the Court finds that oral argument is not needed.

meniscus transplant became necessary after plaintiff "tweaked" his right knee again while playing indoor soccer [*Id.* p. 2–3]. Because plaintiff anticipated his recovery would take longer than his recovery from the previous surgery, he asked his supervisor, Ashley Kittrell, about the possibility of taking leave [*Id.* p. 3; Doc. 30-1 p. 3]. His supervisor submitted his leave request and allegedly said, "It sucks that you're going to be out for as long as you are, keep me posted, let me know, your job will be here when you get back" [Doc. 30-1 p. 3]. According to plaintiff, his supervisor's instructions were to be in communication with her and to return as a personal trainer when cleared by his doctor [*Id.* p. 4].

On the day of his transplant operation, August 8, 2011, plaintiff went on Family and Medical Leave Act ("FMLA") leave, which "is limited to a total of 12 workweeks" under Department of Labor regulations [Doc. 25 p. 3; Doc. 30-6; 29 C.F.R. § 825.200(a)]. Four days later, on August 12, 2011, plaintiff received a letter from Jenny Johnson, The Rush Benefits Coordinator [Doc. 32-1 p. 16]. The letter stated, in pertinent part:

> I have received the FMLA paperwork for you. . . . [Y]our FMLA time is not paid leave. It is primarily job and pay rate security. In the FMLA paperwork, it states that your surgery was schedule[d] for August 8, 2011 and the duration of your leave will be 6 to 12 weeks. Please notify your supervisor that they will need to submit a [Personnel Change Notice] to Payroll placing you on FMLA leave. Please make sure your doctor lets me know when you are cleared for work before you return. Upon your return your supervisor will need to submit another [Personnel Change Notice] to Payroll returning you to Active status. While on leave you will need to make arrangements with me to send in your insurance premiums (since you will not have a payroll check for us to deduct from).

2

[*Id.*].  In plaintiff's view, this letter "ordered [him] that he could not return to work until he had a return to work release authorization from his doctor" [Doc. 30-1 p. 4].  Plaintiff understood he would have, at most, twelve weeks of FMLA leave [Doc. 24-1 p. 15–16].

Plaintiff's knee began to recover, and on September 29, 2011, about seven weeks after the surgery, his physician discontinued his brace and permitted him to walk and jog, but encouraged him to not bear weight past ninety degrees [*Id.* p. 53].  In the fall, plaintiff coached soccer and worked out a few times at The Rush facilities [Doc. 25 p. 4].  He touched base once with his supervisor Ashley Kittrell and also ran into district fitness manager Mandy Lawson [*See* Doc. 24-1 p. 16].

Plaintiff's FMLA leave expired in late October[2] [*see* Doc. 30 p. 4–5], and he claims he did not return to work "based on the instructions that Jenny Johnson gave me and instructions of my boss, Ashley Kittrell, to come back once I'm released from my physician" [*Id.* p. 8].  On November 21, 2011, The Rush Benefits Coordinator, Jenny Johnson, contacted plaintiff by email:

> I have not yet received your insurance premiums for the month of October.  Your FMLA leave technically ended on October 26, 2011.  Please respond to this email if your intentions are returning to work.  If I do not hear from you in the next two days, I will cancel your insurance effective 10/31/2011.  Thanks.

---

[2] The Personnel Change Notice that terminated plaintiff marks October 27, 2011, as the effective date of his termination [Doc. 32-2 p. 6].  Twelve weeks from the day his FMLA leave began, however, is October 31, 2011 [*See* Doc. 30-3 p. 4–5].  It appears The Rush may have calculated twelve weeks from plaintiff's last day of work, August 3, 2011.  Regardless, in light of the evidence and arguments before the Court, the precise October date is not legally significant.

3

[Doc. 24-1 p. 34]. Plaintiff responded by email that same day, stating, "I went to the doctor [at] the end of October and was not released for work yet. My next appointment isn't until December 29th. At this point I expect to be released to return to work" [*Id.* p. 34–35]. His email went on to discuss how therapy "has gone very slow" and to discuss "the job function as a personal trainer and things [he] would not be able to do that [he had] not been cleared to" [*Id.* p. 36]. This email exchange, and the fact that his membership card scanned properly in the month of November, allegedly contributed to plaintiff's belief "that everything was okay" and that his job would be secure if he continued to see his doctor and wait on his doctor to give him a return to work release [*See* Doc. 30-1 p. 4, 6–9].

Just two days after the conversation with the Benefits Coordinator, on November 23, 2011, Sarah Miller, a Human Resources representative, completed the Personnel Change Notice ("PCN") that led to plaintiff's termination [*See* Doc. 32-2 p. 6; Doc. 30-3 p. 4]. At the time, managers at The Rush would submit PCNs on an employee's behalf to make a change to their personnel record [Doc. 30-3 p. 2]. Although plaintiff's PCN was completed on November 23, 2011, it was backdated to reflect a termination date of October 27, 2011 [*See id.* p. 5–6; Doc. 32-2 p. 6].

The section of the PCN form titled "Termination Reasons" instructed Ms. Miller to "check one box" and "provide a brief description of termination circumstances" [Doc. 24-1 p. 69]. There were two sections of boxes to check from: a "Voluntary" section which included, for example, "Medical Reasons," "Company Policies," and "Other," as

4

well as an "Involuntary" section which included, for example, "Attendance," "Policy Violation," and "Other" [*Id.*].[3]  Ms. Miller checked "Medical Reasons" under "Voluntary" and wrote, "Michael's FMLA expired and he is not able to return to work at this time.  He has been marked eligible for rehire & can re-apply in the future" [*Id.*].

According to The Rush's employee handbook, "The Rush will consider an employee to have voluntarily terminated his or her employment if an employee . . . '[f]ails to return from an approved leave of absence on the date specified'" [Doc. 25 p. 6].  It appears undisputed, however, that The Rush never explicitly stated to plaintiff that he would no longer have a job if he failed to return to work by a specified date [*See id.* 2–8; Doc. 30 p. 3].  In plaintiff's words, "[a]t no point did they ever say you need to be here at X, Y, Z" [Doc. 30-1 p. 7].  It is also undisputed that The Rush did not notify plaintiff that he had been terminated.  Plaintiff first learned of his termination when he went to The Rush to exercise in December 2011 and his membership card would not scan [*See id.* p. 9].  At no point did plaintiff approach The Rush about allowing him to work as a personal trainer with accommodations for his physical limitation or request to be placed in any other position at The Rush [*See* Doc. 24-1 p. 2–3].

Approximately five months after the August surgery, on January 13, 2012, plaintiff's physician cleared plaintiff to return to work as a personal trainer and gave him no permanent restrictions [*See id.* p. 54; Doc. 25 p. 6].  The physician noted that plaintiff

---

[3] At the time, the Personnel Change Notice form did not have a box under "Termination Reasons" for FMLA expiration or for failure to return after approved leave [*See* Doc. 24-1 p. 69; Doc. 30-3 p. 5].

was "doing so well" but still wanted him to "limit weight bearing past 90 degrees for heavier exercise type things" and to wait one more month before running, skipping, or jumping [Doc. 24-1 p. 54]. As of February 9, 2012, almost exactly six months after the August surgery, plaintiff believed he no longer had a disability [*See* Doc. 30-1 p. 2 ("I do not have a disability now, but I did have one.")].

Plaintiff then brought this action, seeking, among other things, at least $275,000 in back pay, front pay, and the value of The Rush stock options [*Id.* p. 10–11; Doc. 1 p. 8]. The Court dismissed Counts II (mental and emotional distress), III (breach of contract), and IV (FMLA violation) of the complaint, as well as any claim under the Rehabilitation Act of 1973 [Docs. 15, 19]. Defendant now moves for summary judgment on plaintiff's remaining claims of disability discrimination and misrepresentation [Doc. 24 p. 1–2].

## II.     Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III. Analysis

Having reviewed the record as well as the relevant legal authorities, the Court concludes that none of plaintiff's claims survive summary judgment.

### A. Disability Discrimination

The Americans with Disabilities Act ("ADA") provides that an employer "'shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Whitfield v. Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011) (quoting 42 U.S.C. § 12112(a)). To make out a prima facie case of employment discrimination under the ADA, a plaintiff must generally show: (1) he is disabled; (2) he was otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; and (4) he suffered such action under circumstances that give rise to an inference of unlawful discrimination. *See Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 364–65 (6th Cir. 2007) (citations omitted). "The key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Id.* at 365 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

8

Under the *McDonnell Douglas* burden-shifting framework, after a plaintiff makes out a prima facie case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). If the defendant does so, then the burden returns to the plaintiff to prove that the stated reason is pretextual. *Id.* "At the summary judgment stage, the district court must determine whether there is 'sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry.'" *Rachells v. Cingular Wireless Emp. Servs., LLC*, 732 F.3d 652, 661 (6th Cir. 2013) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)).

As discussed herein, the Court concludes plaintiff has failed to establish a prima facie case of disability discrimination and has failed to create a genuine dispute that defendant's non-discriminatory reason for terminating him is pretextual.

### 1. Plaintiff's Prima Facie Case

Plaintiff's amended complaint alleges that The Rush "terminated Plaintiff because of his disability" [Doc. 16 ¶ 30]. Having reviewed the facts of this case and the relevant law, the Court finds that plaintiff has not presented sufficient evidence that The Rush discriminated against plaintiff because The Rush regarded him as disabled.

Under the ADA, a person is disabled if he has "a physical or mental impairment that substantially limits one or more major life activities" or is "being regarded as having such an impairment." 42 U.S.C. § 12102(1). Plaintiff's response to defendant's motion

focuses on the "regarded-as-disabled prong" [Doc. 30 p. 5–7],[4] which "comes into play when an employee 'is perfectly able to perform a job, but [is] rejected . . . because of the myths, fears, and stereotypes associated with disabilities.'" *Baker v. Windsor Republic Doors*, 414 F. App'x 764, 771 (6th Cir. 2011) (internal quotations omitted) (quoting *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008)).

In support of his regarded-as-disabled argument, plaintiff cites the Personnel Change Notice where Human Resources representative Sarah Miller checked the "Medical Reasons" box as the reason for terminating him [*See* Doc. 30 p. 6–7]. The Court, however, will not infer discrimination from that document or related evidence. Plaintiff admits the fact he was not released by his physician to return to work is a medical reason for not returning after his FMLA leave expired [*See* Doc. 30-1 p. 8]. Although it may have been more appropriate to check the box for "Company Policies" or "Other [P]lease Explain Below," there was no box such as "Expiration of Approved Leave" [*See* Doc. 24-1 p. 69]. And, in accordance with the form's instructions to "provide a brief description of *termination circumstances* in [the] Comment Section," Ms. Miller stated, "[Plaintiff's] FMLA expired and he is not able to return to work at this

---

[4] Because the regarded-as-disabled prong does not apply "to impairments that are transitory and minor," 42 U.S.C. § 12102(3)(B), the parties presented arguments on that issue [*See* Doc. 25 p. 13–16; Doc. 30 p. 7]. Plaintiff also asserts that "by having surgeries number three and four on the same knee in 2011 less than six months apart, [he] also fit[s] the definition of being disabled" [Doc. 30 p. 7]. However, because the Court finds insufficient evidence of discrimination, The Rush gave a non-discriminatory reason for terminating plaintiff, and plaintiff has not created a genuine dispute as to pretext, the Court will not analyze whether plaintiff was disabled or whether his injury was transitory and minor. And because these issues are the focus of plaintiff's Motion to Strike Supplemental Brief Filed by Defendant, the Court finds that motion [Doc. 54] is moot.

time" [*Id.* (emphasis added)].  In addition, the record contains Ms. Miller's account of her conversations with a management level official regarding plaintiff's termination, and the Court finds that account does not support an inference of unlawful discrimination.[5]

Plaintiff mentions that defendant "had never given him specified dates for FMLA expiration" and asserts that defendant "continuously misled [him] into believing his job was secure as long as he continued to see his doctor and not return until his doctor released him" [Doc. 30 p. 8].  But it is not apparent, and plaintiff has not provided evidence or legal authority to support, how these facts give rise to an inference of discrimination.

In sum, the Court finds the available evidence does not give rise to an inference that "myths, fears, and stereotypes associated with disabilities," *Gruener*, 510 F.3d at 664, motivated The Rush's ultimate decision to terminate plaintiff.

## 2. Defendant's Non-Discriminatory Reason for Termination

Even if plaintiff established a prima facie case, the Court finds The Rush articulated a legitimate, non-discriminatory reason for terminating plaintiff—he was

---

[5] When asked to speak about her conversations with management regarding plaintiff's termination and the Personnel Change Notice, Ms. Miller stated:

> I just spoke to [one management official] regarding that [the Benefits Coordinator] had communicated with [plaintiff] via email, notified [plaintiff] that [his] FMLA was expiring, that he . . . had not yet returned to work, and if we could proceed with terminating him but marking him eligible for rehire so that he could come back after he was released from his physician.

[Doc. 30-3 p. 6].  Plaintiff apparently did not seek to depose this management official [*See* Doc. 32 p. 5 n.3; Doc. 34].

11

unable to return to work after his FMLA leave expired—and finds that plaintiff has not created a genuine dispute that the reason was pretext for discrimination.

The Rush's employee handbook provides that "The Rush will consider an employee to have voluntarily terminated his or her employment if an employee . . . '[f]ails to return from an approved leave of absence on the date specified'" [Doc. 25 p. 6]. Even though defendant never gave plaintiff a specified date for FMLA expiration, plaintiff was an at-will employee [Doc. 30-1 p. 10], and he was aware his FMLA leave expired in late October, at least three weeks before The Rush took action to terminate him [*See* Doc. 24-1 p. 16 ("When I saw [the August letter from the Benefits Coordinator], I knew that FMLA leave would be 12 weeks.")]. When directed to give a "brief description of termination circumstances," The Rush Human Resources employee wrote, "[Plaintiff's] FMLA expired and he is not able to return to work at this time. He has been marked eligible for rehire & can re-apply in the future" [*Id.* p. 69]. Accordingly, The Rush has presented a legitimate, non-discriminatory reason, and the burden shifts back to plaintiff to demonstrate that the reason is pretextual. *See Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 431 (6th Cir. 2014) (shifting burden back to plaintiff to demonstrate pretext after defendant asserted it terminated plaintiff based on his inability to return to work at the end of his FMLA leave period).

12

### 3. Pretext

"Plaintiffs may show that an employer's proffered reasons for an adverse employment action are pretext for discrimination if the reasons '(1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action.'" *Demyanovich*, 747 F.3d at 431 (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)). Here, plaintiff cannot create a genuine dispute as to pretext.

First, plaintiff's termination was based in fact. His FMLA leave expired in late October, more than three weeks before The Rush took action to terminate him on November 23. And two days before his termination, plaintiff informed the Benefits Coordinator via email why he could not yet return as a personal trainer [*See* Doc. 24-1 p. 34–36 (stating therapy "has gone very slow" and discussing "the job function as a personal trainer and things [he] would not be able to do")]. This fact—that plaintiff informed The Rush after his leave period ended of his limitations that would prevent him from working—militates against a finding of pretext. *Cf. Demyanovich*, 747 F.3d at 431 (finding genuine dispute as to pretext when employer purportedly terminated employee for "inability to return to work at the end of the statutory leave period" but "did not even have access to information regarding [plaintiff's] physical limitations at the time he fired [him]").

Second, FMLA expiration and plaintiff's inability to return to work appear to have actually motivated the action. The Personnel Change Notice noted FMLA expiration as the reason for termination and that plaintiff would be eligible for rehire. Examining the

13

Personnel Change Notice as a whole, the fact that the box for "Medical Reasons" was checked does not suggest that discrimination was The Rush's real reason for terminating plaintiff. At the time the form was prepared, plaintiff had not been released by his doctor to return to work due to his surgery [*See* Doc. 30-1 p. 8], and even plaintiff admits this is a medical reason for not returning to work [*See id.*].

Third, expiration of FMLA leave and inability to return to work are reasons sufficient to warrant termination. *See Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 506–07 (6th Cir. 2006) ("[A]n employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave."). The Rush had the authority, as explained in its employee manual, to terminate at-will employees and to terminate employees who do not return from an approved leave of absence [Doc. 3-1 p. 2 (discussing at-will employment at The Rush); Doc. 25 p. 6 (stating that The Rush will consider an employee to have voluntarily terminated his employment if the employee "[f]ails to return from an approved leave of absence on the date specified")]. The evidence does not suggest that the Court should view The Rush's failure to provide plaintiff with a specific date that his FMLA leave would expire as evidence of discrimination or pretext as opposed to, for example, an administrative or policy error. Having closely reviewed the record, the Court thus finds

14

plaintiff has not created a genuine dispute that The Rush's reason for terminating him was pretext for discrimination.[6]

Accordingly, because the available evidence is insufficient to support an inference of discrimination or to support that defendant's non-discriminatory reason was pretextual, the Court finds that summary judgment on plaintiff's disability discrimination claim is appropriate.

### B.    Failure to Accommodate

Assuming the amended complaint can be construed to include a failure-to-accommodate claim [*see* Doc. 16 ¶¶ 27–29], that claim also fails for multiple reasons.

First, plaintiff's response brief frames his disability claim solely as a "regarded as" claim [*see* Doc. 30 p. 5–6], for which failure-to-accommodate claims are not available. *See* 29 C.F.R. § 1630.9(e) ("A covered entity . . . is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong.").

Second, plaintiff's Charge of Discrimination points only to a claim of improper refusal to keep his job open while he recovered and to his belief that his disability was a factor in The Rush's decision to terminate him [*See* Doc. 24-1 p. 52].  On similar facts, the Sixth Circuit has held that an employee failed to exhaust her administrative remedies

---

[6] Nor is pretext established by plaintiff's argument that defendant "changed its story to say [plaintiff's] coaching soccer, job hunting, and getting exercise while he was on FMLA leave were factors to the termination" [Doc. 30 p. 7].  The Court agrees with defendant that "The Rush cited these facts in its Motion, not as reasons for his termination, but to explain that he was very active while out on FMLA leave and, hence, not disabled" [Doc. 32 p. 6].

and therefore could not bring that claim in federal court. *See Jones v. Sumser Retirement Vill.*, 209 F.3d 851, 853–54 (6th Cir. 2000) (reasoning that "nothing in the charge [of discrimination] pointed to any claim other than an improper refusal to keep [plaintiff's] job open while she recovered").

Third, even assuming plaintiff's failure-to-accommodate claim may be brought, to establish a prima facie case for failure to accommodate, a plaintiff must show, among other things, that he requested an accommodation. *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982–83 (6th Cir. 2011). It is undisputed that plaintiff never requested an accommodation from The Rush. *See Cash v. Siegel-Robert, Inc.*, 548 Fed. App'x 330, 335 (6th Cir. 2013) (affirming summary judgment as to plaintiff's failure-to-accommodate claim because there was "no proof that he asked [his employer] to grant him a reasonable accommodation to return to his job . . . or to transfer him to a less strenuous job commensurate with his physical restrictions"). Without citing any legal authority, plaintiff suggests that defendant had a duty to accommodate him, particularly after his "tenure in working in really every position" at The Rush [*See* Doc. 32-1 p. 2; Doc. 30 p. 6 ("Defendant was on actual notice that Mr. Larson could not do his job of personal trainer given the condition of his knee. However, there were other jobs . . . Mr. Larson could do and was willing to do in the sales department . . . and in the operations department.")]. But the employee, not the defendant, "bears the burden of proposing reasonable accommodations," and "an employee's claim must be dismissed if the

16

employee fails to identify and request such reasonable accommodations." *Johnson*, 443 F. App'x at 983.

For all these reasons, plaintiff's failure-to-accommodate claim will be dismissed.

### C.    Misrepresentation

Plaintiff also alleges that a reasonable jury could find defendant liable for both intentional and negligent misrepresentation [*See* Doc. 30 p. 8–10]. Apparently relying on the August letter from Benefits Coordinator Jenny Johnson, the three oral conversations with his supervisors, and the November email from Ms. Johnson, plaintiff contends The Rush misrepresented that his leave of absence would remain approved and his job secure until his doctor released him to return to work [*See id.* 9–10]. Before addressing the law of misrepresentation, the Court examines whether there is sufficient evidence to support that such a representation was made by The Rush.

Plaintiff's response brief argues The Rush misrepresented that "as long as Mr. Larson continued to follow the instructions in the August 12, 2011 Rush Letter . . . and see his doctor until his doctor released him to return to work his leave of absence would remain approved and his job secure" [Doc. 30 p. 9 (citing Larson Dep. 150:5–10, June 4, 2014) ("I was in communication with my boss, with my benefits coordinator of what was going on, who gave me the impression, who led me down the direction that everything was okay. At no point did they ever say you need to be here at X, Y, Z.")]. The deposition testimony cited by plaintiff is insufficient to support this proposition. Nor

does the Court find, upon its independent review of the record, sufficient evidence to support this proposition.

When asked in his deposition about his understanding of the August 12, 2011, letter, plaintiff stated, "I knew that FMLA leave would be 12 weeks. If I was still in recovery and not cleared by my doctor, it would be a leave of absence but my job was still there" [Doc. 24-1 p. 16]. Plaintiff's impression was based on his July conversation with supervisor Kittrell about the prospect of taking leave, in which plaintiff claims she said, "It sucks that you're going to be out for as long as you are, keep me posted, let me know, your job will be here when you get back" [*Id.*; Doc. 30-1 p. 3], and instructed him to be in communication with her and to return as a personal trainer when cleared by his doctor [Doc. 30-1 p. 4]. Given the conversation's context of taking approved leave and the letter's FMLA context, there is insufficient evidence that The Rush represented plaintiff would have job security beyond that provided by a formally-approved leave of absence.

According to defendant, "nothing in the August 12, 2011 letter . . . indic[a]ted that his leave would remain approved until he was released from his physician. Rather, the letter stated that he must be released from his doctor before he could return to work" [Doc. 32 p. 7]. The evidence supports defendant's view. Signed by The Rush Benefits Coordinator, the letter discusses essential aspects of FMLA leave and does not mention any other type of leave [*See id.*]. Although the phrases "please make sure your doctor lets me know when you are cleared" and "upon your return," standing alone, could

18

possibly suggest plaintiff's job was secure pending his doctor's clearance, the letter's FMLA context and the statement "the duration of your leave will be 6 to 12 weeks" militate against such a finding [*See* Doc. 32-1 p. 16].

In sum, even when viewing the August 12 letter and the oral conversations together, and in the light most favorable to plaintiff, there is insufficient evidence to support plaintiff's contention in his response brief that The Rush represented that, notwithstanding the fact he was going on (or already on) FMLA leave, that plaintiff's employment would resume upon clearance by his doctor, whenever that may be, or that plaintiff's leave of absence would remain approved and his job secure after his FMLA leave expired. Accordingly, the Court will not analyze whether such a representation would constitute intentional or negligent misrepresentation under Tennessee law.

The Court will, however, analyze evidence plaintiff has pointed to, including his supervisor's statement "your job will be here when you get back" and her instructions to return to work once cleared by his physician. The torts of intentional and negligent misrepresentation share common features, including that they cannot be based on representations of future events. *See Glanton v. Beckley*, No. 01-A-01-9606-CV-00283, 1996 WL 709373, at *9 (Tenn. Ct. App. Dec. 11, 1996) ("Perceiving some connection between [the tort of negligent misrepresentation] and the tort of fraudulent misrepresentation, Tennessee courts have joined several other courts in requiring that the false information must consist of statements of a material past or present fact."). The representations must also be false. *See Walker v. Sunrise Pontiac-GMC Truck*, 249

19

S.W.3d 301, 311 (Tenn. 2008). For intentional misrepresentation, the false statements must have been made knowingly, recklessly, or without belief in their truth, and, for negligent misrepresentation, it must be shown that defendant did not exercise reasonable care in obtaining or communicating the information. *See id.* Here, plaintiff has not created a genuine dispute that the available evidence constitutes either form of misrepresentation.

A statement qualifies as a representation of a present or past fact, as opposed to a representation of a future event, if it "involve[s] a present or past fact" or is "based at least in part on [an] alleged present fact." *Cummins v. Opryland Prods.*, No. M1998-00934-COA-R3-CV, 2001 WL 219696, at *8–9 (Tenn. Ct. App. 2001). A party therefore may misrepresent a present or past fact even if the representations happen to involve future events—here, plaintiff's eventual return to work upon clearance by his doctor in the future. *See id.* It appears possible that a defendant employer could misrepresent the present fact that, in a particular situation, an employee's employment would resume upon clearance by his doctor, regardless of when his formally-approved leave expires. However, as discussed above and having reviewed the record, the Court concludes there is insufficient evidence to support that such a representation was made to plaintiff.

As for statements from his supervisors along the lines of "your job will be here when you get back," they constitute representations of future events that are not based on any alleged present fact. *See id.* at *8–9. Plaintiff concedes his supervisors did not base their statements on an understanding of exactly (or even approximately) how long

20

plaintiff would be unable to work and that they gave him no indication how long his employment would remain secure [*See* Doc. 30-1 p. 10].

Even assuming The Rush made a representation of a material present or past fact, the evidence does not support that the statements or instructions were false, were made either recklessly or without belief in their truth, or were communicated without reasonable care. First, the statements were made before or while plaintiff was on FMLA leave and therefore were not necessarily false or made recklessly.[7] Statements such as "your job will be here when you get back" are consistent with his anticipated return at the end of his approved leave period, and instructions to return when cleared by his doctor are consistent with the instructions in the August FMLA letter. Second, the evidence does not indicate that the supervisors suggested plaintiff would receive leave beyond FMLA leave or beyond other formally-approved leave. Third, plaintiff admits that his supervisors, at the time they made such statements, did not know how long he would be gone from work and did not know that he would be terminated.

---

[7] The Court's disagreement with plaintiff's view of the type of representation made undermines plaintiff's sole argument in support of the knowing or reckless element of intentional misrepresentation, that is, "[t]he representation was made either knowingly or without belief in its truth or recklessly because supervisory level Rush officials were making the representation and under the doctrine of principal and agency the Rush vicariously had imputed knowledge that Mr. Larson had, throughout, been misled to believe by the Rush agents (i.e., Jenny Johnson and Ashley Kittrell) that he would not be terminated while he continued to see his doctor until he received his return to work release even after the alleged FMLA expiration" [Doc. 30 p. 9 (citations omitted)]. Because the Court finds insufficient evidence that plaintiff's contended misrepresentation was made, the Court will not analyze whether plaintiff's contended misrepresentation [*see id.*], if made, would have necessarily been made either knowingly or recklessly given the case's corporate context.

Plaintiff makes one argument regarding falsity: that the representations about his job status made to him in the November 21 email were false because he was terminated effective October 27 [*See* Doc. 30 p. 9]. It appears undisputed, however, that The Rush took action to terminate on November 23, not on the "Effective Date of Action" of October 27 or on any other day prior to the November 21 email exchange [*See* Doc. 32-2 p. 6; Doc. 30-3 p. 5–6]. Nor has plaintiff pointed to evidence suggesting that the Benefits Coordinator was aware plaintiff had been or would be terminated when she emailed him on November 21.

Similarly, plaintiff asserts The Rush did not exercise reasonable care in communicating the information about his job status "because in fact the Rush terminated him effective October 27, 2011 and Rush supervisors continued to mislead [plaintiff] about his job status beyond that point" [Doc. 30 p. 10]. Plaintiff's assertion also appears to rely on the email exchange with the Benefits Coordinator in late November, two days before he was terminated. But the fact that plaintiff's termination was backdated to reflect the expiration of his FMLA leave supports the opposite assertion—that is, that the Benefits Coordinator did not fail to exercise reasonable care because, at the time she emailed plaintiff, she did not know he would be terminated. Moreover, as plaintiff admits, in the month of November, he was asked only when he expected to come back to work and was not specifically told that he still had his job or that he just needed to keep going to his doctors and get better [*See* Doc. 30-1 p. 9].

In sum, while plaintiff may have had a false impression, there is insufficient evidence that the supervisors' statements were based on any material present fact, or that any of The Rush's representations were false or were communicated recklessly or without reasonable care. Thus, plaintiff's misrepresentation claims will be dismissed.[8]

## IV. Conclusion

For the reasons stated herein, the Court will **DENY as moot** plaintiff's Motion to Strike Supplemental Brief Filed by Defendant [Doc. 54] and will **GRANT** defendant The Rush Fitness Complex's Motion for Summary Judgment [Doc. 24] in all respects. The Court will **DISMISS** all remaining claims against The Rush and direct the Clerk of Court to **CLOSE** this case.

ORDER ACCORDINGLY.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE

---

[8] The Court also notes, though the parties did not mention it, that courts applying Tennessee law have disallowed negligent misrepresentation claims in the employer-employee discharge context. *See Shelby v. Delta Air Lines*, 842 F. Supp. 999, 1015–16 (M.D. Tenn. 1993) (holding that plaintiff "has no cause of action for negligent misrepresentation as a matter of law"); *Moore v. Alstom Power Turbomachines, LLC*, 1:12-CV-292, 2013 WL 915555, at *6–7 (E.D. Tenn. Mar. 7, 2013) (holding that, "although not discussed by the parties, negligent misrepresentation is unavailable to plaintiffs in the employer-employee context"). Some cases have considered negligent misrepresentation in the employment context without addressing whether it is applicable, *see, e.g.*, *Shatford v. smallbusiness.com*, No. M2003-02315-COA-R3-CV, 2005 WL 1390092 (Tenn. Ct. App. June 13, 2005), but it appears the overwhelming majority of negligent misrepresentation cases in Tennessee are in the commercial context. In addition, the Tennessee Supreme Court has cited *Shelby* for the proposition that "recovery has been allowed only when the advice or information negligently supplied was given in the course of a commercial or business transaction *for guidance of others in their business transactions*." *Robinson v. Omer*, 952 S.W.2d 423, 427–28 (Tenn. 1997) (emphasis in original).

23